Good morning. May I please take the floor? Attorney Adriana Sanchez, on behalf of the plaintiffs, I would like to reserve two minutes for a rebuttal. Just a moment. Sorry. I have two appeals. It's the wrong number. Well, anyway, okay. Thank you. All right, now you may proceed. Thank you. I would like to reserve two minutes for a rebuttal, Your Honor. Yes, you may have it. I would also like to recognize the presence of plaintiffs here today in the courtroom. Your Honor, this case involves 273 plaintiffs of Puerto Rican origin that were employees of FEMA in its National Processing Service Center located here in Puerto Rico. I would refer to it as a NPSI for short, to make it simple. This type of centers, the purpose of this type of center is to process claims of victims of presidentially declared disasters. And they filed this complaint because of the numerous and continuous acts of discrimination they suffered from FEMA. Could I ask you to outline, please, exactly what the three or four claims are that you're making? You're making a claim that the closing of the center was improper for various reasons. Right. What else? Also, the implementation of our rotation system that limited the amount of employees allowed to work in the facility to 20 employees. And also... Hang on. The reduction in the number of employees working during that period when they were fixing up the facility. Right. Okay. Then what else? Well, those are the main facts that the District Court determined were... No, no, no. I'm asking about your claims. Our claims is that these acts constitute discrimination and retaliation against the plaintiffs because of all the EEO complaints that had already been filed. Okay, so discrimination and then retaliation. Yes. Go ahead. Okay. So this case, Your Honor, has been strongly litigated for six years now. And a considerable discovery has been made after which the defendants filed a motion for summary judgment that was opposed also by the plaintiffs. And this case is simple, Your Honor. All you have to do is determine and decide whether the District Court judgment, summary judgment, should be reversed. And if so, then the jury trial should be heard. And before... What facts are in dispute? Right. Before I get into the facts that are disputed, I would like to start by pointing out that there is no controversy regarding the fact that all the events that took place in this Puerto Rico NIPC had nothing to do with job performance. This was admitted by female officials and it has been uncontested that all the plaintiffs were capable, responsible, bilingual employees with outstanding performance rates that, however, were placed in a lower classification even... You might want to answer the question. Yes. Well, there are multiple controversies of fact. Specifically, we've listed more than 15 in our brief. But the major controversies are regarding the reasons for the implementation of the safety, I'm sorry, of the rotation system and the closure of the center. FEMA has argued that the reason to implement the rotation were safety concerns. And the court credited that version of the case and made credibility determinations when this should be left for the jury because the plaintiffs presented evidence to show that there was a discriminatory animus and retaliatory animus towards the Puerto Rican employees because of the EEO complaints that had been filed. And this precisely is a matter for the jury to determine after... That's on your retaliation claim. I'm sorry? That's on your retaliation claim. That's not on your discrimination claim. That there are controversies regarding the reasons behind the implementation of the rotation. I think what Judge Lynch is saying is that this is my understanding that you're not claiming discriminatory animus in your discrimination claim, but this is just a discriminatory impact. Right. Yeah. Well, we don't have to make a showing of discriminatory motive, but as this is a discrimination under Title VII, a discrimination case, there's a showing of the claim. And as although there is no discriminatory motive to be shown, there's a discriminatory animus that plaintiffs have had need and have put forth. What are the facts that have to do with discriminatory animus? Well, plaintiffs pointed out the multiple EEO complaints that had been filed by the Puerto Rican employees since as early as 2006, precisely because of the disparity in the classification they were suffering. They were classified as low as GS-9 employees when their non-Puerto Rican counterparts were classified as GS-11. And because of this disparity, the Puerto Rican employees started filing complaints. And after they started filing these complaints, FEMA started to make inspections in the center. And, Your Honor, these employees had been working in this same center for 13 years. And in all those years, there was never an issue or a concern because of the safety of the building, not because of fire, not because of health. There wasn't even ever a concern that this NIPSI, the Puerto Rican NIPSI, couldn't run as a permanent fixed facility. And only after the employees, the Puerto Rican employees, started complaining because of discrimination and filing formal EEO complaints is that FEMA started noticing this. Counsel, is there a serious contention that there weren't safety issues? Yes, there is. You are actually arguing that there were no safety issues which required attention? Well, according to inspection, they were But you're saying those issues should have been ignored and they weren't because there was retaliation against people for having filed complaints? They shouldn't have been ignored. But if they were really concerns, they should have been brought before, not only after the employees started filing the EEO complaints. All right. Let's assume there are legitimate safety concerns that have to be addressed. Okay. Okay. Then what happens to your case? Well, what happens is, Your Honor, is that we have presented evidence to show that there were alternatives that FEMA could have imposed or implemented in the center to address their concerns and also that wouldn't have been so discriminatory against the Puerto Rican employees and the court ignored all of them. Okay. So you're saying the decision to address the safety concerns by reducing the number of employees while the work was going on at the facility was motivated by discrimination or retaliation? There was an Okay. Then let me ask the question Judge Torrey has been asking. What is the In addition to the EEO complaints, there's also evidence that plaintiffs have presented that by May 23rd, Ms. Kathy Fields, which was FEMA's branch chief for NIFC operations, had already traced out by May 23rd a transition plan to close the center because it was her suggestion by that time that the center be closed. And by that day, she had already traced out a transition plan with a limited amount of employees that would carry out the closure that was precisely of 15 to 20 employees. Later in July 19, when she implemented the rotations, the exact same number, she herself assigned the exact same amount of employees to the rotations. So plaintiffs have presented evidence that the real reason behind the implementation of the rotation could have been that they were just carrying out their determination or her suggestion to close the center and not because they were really concerned and that there were safety issues that needed the employees or the capacity of the center to be limited at that time. At that moment, there had only been one issue left to repair and that same item, which was an egress route, was also pointed as a deficiency in a September inspection and did not prompt a closure of the center or the implementation of our rotation system. So plaintiffs allege that there was a back agenda that was already planned before the implementation of the rotation. It wasn't the question since the lease was about to expire whether it was worth the investment of a lot of money to maintain a facility that the expenditure would go well beyond the repair of the existing facility. And that, as I recall their case, they say, look, the need for Spanish language responders to request from the public had gone down. Partly it had gone down because of internet availability. Partly it had gone down because of Spanish-speaking facilitators at the other facilities. And partly there was just less demand for it. And in light of that, the decision to not continue a facility here was cost-effective and FEMA was under pressure to be very cost-effective. That's their argument. What is your evidence that even if that wasn't the real reason, under Mount the Puerto Rico NFC did much more than just answering calls. In fact, they had 26% of the registration capacity of the center. And they were processing claims, which meant they were handling appeals. They were making eligibility determinations. They were reviewing cases. They were also making translation work. So there's evidence in our position to the Motion for Ceremonial Judgment stating that the main competency of the center was not to take only Spanish calls. And they had been doing this since 1998, although they were classified as a call center. Plaintiffs have also provided evidence to show that the internet registration, as well as the Spanish call volume decrease, was a matter that affected the NFC system. And the overstaffing that they allege as a reason to close the center is a NFC system, not a Puerto Rico NFC issue. So what plaintiffs propose is that if there's an overstaffing because of a workload reduction, then FEMA should have followed the FEMA manual handbook, which provides precisely for when there's a reduction in workload and for employees to be released based on performance. And if FEMA would have followed this, then there was no need to close the center because they've done this before. This is the nature of the agency. When there's a reduction in workload because there's no disaster that had been declared, then the employees are released based on performance. I'm following your argument until we get to the lease and the cost. And that's what's troubling me. Because there's no doubt from the record that everybody here was working hard, that everybody here was bilingual so that they could process claims in English too, and everybody was doing what everybody was doing on the mainland. But when you get to the renewal of an expensive lease and the cost of either moving the new facility or repairing this, this is where it's hard to say that the mount defense just goes out the window. Well, Your Honor, the thing is that when FEMA started and gave this reason that relocating the center or maintaining it open as the operational costs were $17 million, when they did this at the same time, the VA NIPSI, that's the Virginia National Processing Service Center, was moving to a new facility. So if there were concerns about budgets and operational costs, why wasn't it a consideration for FEMA to instead of relocate that center, which is also $10 million more expensive than the Puerto Rico center and doesn't have the bilingual employees, why wasn't that a consideration? And now it was a consideration when also other leases had to expire before and never FEMA evaluated the possibility of closing another center if there was a reduction. Thank you. Adam Jett for the United States. May it please the Court. It seems like at this point the plaintiffs have conceded that there in fact were serious safety concerns with the facility in San Juan. And so at that point, as I think plaintiffs basically now agree, the question is simply whether there was another alternative. And it's the plaintiff's burden to establish that one of those other alternatives should have been pursued. I appreciate your argument, but you might start by answering this last point because I was about to ask you. As I understand it really, your defense is basically you had business and safety within business considerations as to the cost of remaining in the present facility or what was the facility in Puerto Rico. Am I summarizing your argument? Yes, I think that's right. The facility was unsafe and FEMA decided that it wasn't worth the substantial upfront cost to move to a new modern facility. What about this facility you opened up after you closed Puerto Rico? You opened up one in California, as I understand it. So the facility that was opened up in California is not, I think my friend has abbreviated it a NPSI. It's a different kind of center that does something else. And by the way, it was opened I believe three years after the center closed. So the fact that three years later an agency spends some money on something different doesn't raise a triable question about whether either the center in Puerto Rico was safe or modern. I think my friend now concedes that it was not. Nor does it raise the question whether in fact FEMA really did have millions of dollars to throw around. At the very end of my friend's argument, she suggested that simultaneous to closing the center in Puerto Rico, there was some large expenditure being undertaken with respect to a center in Virginia. Now I'll tell you just as an initial matter, that's actually the first that I've heard of that. I don't believe that they have argued that in their briefs. I'm not familiar with that being on the record. But I am informed by my colleague in FEMA that the transition that was going on in Virginia had already been in the works for several years. So obviously at that point, much of the money had been spent and the project was just wrapping up and then the move was occurring. But again, as far as I know, the plaintiffs have not argued that and that is not on the record. The alternative that the plaintiffs seem to be pressing, their alternative, which they have the burden to establish, is they're saying essentially that there should have been some kind of uniform layoffs from different centers to sort of solve this problem of excess capacity. Now there are a number of problems with that contention. The first is the plaintiffs seem to say that there was some kind of FEMA policy to have uniform reductions. We've addressed that point in our brief in some detail. If I can point you to page 39, footnote 5 in our brief, there was no such policy. What the plaintiffs are pointing to is just a FEMA manual which says that that is a possibility that can be used. It then gives a non-exhaustive and non-exhaustive policy that FEMA may choose to use in that circumstance. And in that footnote, we actually go through every single record site that the plaintiffs have pointed to in support of that proposition. And none of them actually support that point. The record sites are essentially just kind of statements by various plaintiffs that say, you know, at some point there was once a release. That doesn't mean that there was any kind of a policy that would necessitate that. But more importantly, and I think Judge Thompson, you were getting at this before, that doesn't solve the actual problem. I mean, we had a building that was both unsafe in violation of applicable fire code and otherwise just in poor condition. I mean, this is a building that would process claims in the event of a hurricane and didn't have a roof that could withstand a hurricane. As the plaintiffs themselves are arguing, this is a building that didn't have ordinary modern electrical infrastructure. So FEMA then had to spend millions of dollars up front to either move to a modern facility or to vastly renovate this facility. And uniform layoffs in the different centers may have, you know, reduced some salary costs. But nonetheless, FEMA would still be left with those many millions of dollars to spend up front. Does the record show the work that was being performed in Puerto Rico, where it was transferred to? I don't know the answer to that, Your Honor. I don't think the record sort of specifies that. Obviously, there are four different NIPSIs. So, you know, presumably after this one closed, the work continued to be done by the other three. But I don't know exactly how that distribution occurred. And does the record show how much it cost to open the facility in California? I don't believe that it does, Your Honor. Again, obviously, the plaintiffs have indicated in the record that there was a different kind of facility opened in California three years later. It's, I believe, just a call center. It's not a NIPSI. It's the kind of facility that essentially this was before it became a NIPSI. It happened three years later. I don't know what costs were involved. It just seems to be that the plaintiffs were working for years in these substandard conditions and there didn't seem to be a problem with them working under those conditions until they  And I think there are a couple of responses to that. As an initial matter, I think it's actually undisputed in the record that management started inquiring into the conditions in this facility and figuring out how much it would cost as soon as this was first brought to the attention of management. I can point you to page 302 of the appendix, 142 of the appendix, and 147 of the appendix. FEMA, obviously, is a very large agency. They have many different buildings that house many different kinds of operations in different kinds of offices. And the FEMA management, it appears, was not aware of the fact that this building was in poor condition. And once FEMA became aware of that, I mean, what is it to do? Because the plaintiffs are not suing and urging that, you know, 10 years earlier FEMA should have spent $9 million and, you know, kind of fixed up this facility. What plaintiffs are challenging are what they say are adverse employment actions that happened in 2008. So when FEMA management becomes aware of the fact that a building doesn't comply with fire codes, that it doesn't have a roof that can withstand a hurricane, that it doesn't have potable drinking water, at that point, then, an inquiry needs to be made. And FEMA conducted a large multifactored inquiry, while, by the way, and I think this goes to undermine plaintiffs' contention that there was animus, well, at least for the first few months, continuing to pay the employees who worked in that center not to work, because they realized that the building wasn't safe, they weren't going to force these people to come to the office, but nonetheless were continuing to pay them. It's obviously an unfortunate situation that the building was in poor condition, but this is the classic kind of business necessity decision that needs to be made by an employer. You've got a building that's going to cost millions of dollars to upgrade or relocate, and then you ask yourself, well, is it worth the candle? Is it worth spending this huge sum upfront? And it turns out, I mean, no one disputes that the folks who worked in the center were doing a fine job, but it turns out that there were folks elsewhere in the country who were also doing a fine job, and in fact, there was just too much capacity in the system, so it just wasn't worth spending that kind of money upfront. To the extent that the plaintiffs, by the way, Judge Thompson, are trying to draw some inference of animus, I mean, I should point out just the temporal proximity makes the argument very difficult for them, because the last of the protected activity that they can point to is a class complaint that was filed in mid-2007, and the adverse employment action, the first one that they try to point to, occurred about 14 months later in July 2008. I mean, ordinarily, I think what this court and what the Supreme Court has said is that if you're solely relying on temporal proximity, it needs to be extremely close. Fourteen months is a very long period of temporal proximity, particularly when you consider that during those 14 months, first, the class complaint was actually dismissed, so it's particularly odd to infer retaliation based on a complaint that was basically over. Second, it's particularly unusual to retaliate against every single person who works in the center, not just to sort of get at those people who are filing a complaint, and third, and I think most importantly, this is unlike a lot of typical employment discrimination cases where an action may be taken by a line-level supervisor against a particular individual. Ultimately, these decisions were made going all the way up the chain. The director of facilities was involved. The director of occupational safety was involved. The FEMA administrator was involved, and even the DHS secretary himself was involved. There's no evidence that any of those folks were aware of the EEO complaint, and those are the kinds of just basic elements that need to be established to show that there was some kind of retaliatory intent. Is there a factual basis to the allegation that these employees were being paid and had work conditions that were substandard to the same kind of work in the continental United States? With respect to the payment, I don't know the answer to that, Your Honor. You don't know the answer to that? Your Honor, the plaintiffs filed an EEO complaint. That EEO class complaint was dismissed, so obviously I don't know the fact of the matter, and that's not what's at issue in this case. Obviously, if the plaintiffs pursue future litigation based on that claim, then obviously that may come up. With respect to whether the physical facility was in poor condition, yes, it was, and it was once FEMA management discovered that the physical facility was in poor condition, that it then conducted a more thorough inspection, looked at the alternatives, investigated the cost of relocating or upgrading the facility, and then decided that it was not worth that upfront expenditure. Your Honor, I actually need to push back on that factual premise a little bit. The plaintiffs in their briefs say, although point to nothing in the record, that the individual plaintiffs were instructed to make individual claims, and even that fact they pointed to nothing in the record to support it, I'm not aware of there actually having been any individual claims brought after the class complaint. And, you know, obviously we're at summary judgment. That is not a motion to dismiss. They can't just kind of allege that something might have happened. There's nothing in the record to say that there were individual complaints that were filed. And, by the way, to the extent that they would be relying on individual complaints, it then becomes all the more implausible that the retaliation for a few individual complaints would have been to close down an entire center, and all the more implausible that then FEMA would pay everyone for a while to do no work if what they were trying to do was retaliate. Unless the Court has any other questions. Thank you, Your Honor. Your Honor, defendants have argued that they were not aware that the situation of this center or aware of the safety concerns because of all the other premises that they have. No, that wasn't the argument. The argument was as soon as management was made aware, they took action. Right, because they weren't aware because they have many other centers and premises to supervise. Do you have proof they were aware before they say they were made aware? No, what I'm just trying to say is that there are only four NPSEs in the system, and those are the Virginia, the Puerto Rico, the Maryland, and the Texas NPSE. So it's a little bit contradictory that being those the four major centers dedicated to the purpose of the agency, which is provide assistance to the victims, that they are not aware of the condition of the centers. However, all of these are controversies that need to be decided by the jury. Also, FEMA said that the roof of the NPSE couldn't withstand the heat, however, it had done so for all this year. It survived Georges, it survived Gustav that same year in 2008. So it kind of goes to question the real reasons. I'm sorry, you're saying a jury should be asked to decide whether the roof of the facility would withstand the next hurricane, even though they have engineering evidence that supports their concerns? No, what we're saying is that there are multiple factual controversies such as this one that should be presented to the jury, because when they do and when they examine all the evidence and the testimony of the witnesses, they could render a verdict in favor of the plaintiffs. And right now, that's the burden that the court should examine, whether there are controversies. Okay, thank you very much.